## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAILA CHEMPAKASERIL,

      Plaintiff,

v.

MERCY CATHOLIC MEDICAL
CENTER—MERCY FITZGERALD
CAMPUS,

      Defendant.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES Plaintiff, Shaila Chempakaseril, by and through her attorney, Prabhu Narahari, Esq., and files this Complaint alleging as follows:

### I. Nature of the Action

1.      Plaintiff brings this Complaint to recover damages under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e *et seq*., and the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et. seq*. Plaintiff alleges that she was subjected to persistent discrimination and retaliation due to her gender and race by Defendant's staff.

## II. Jurisdiction and Venue

2.      This Court has subject-matter jurisdiction over this action pursuant to Title VII. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. 1331.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367(a).

4.      Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. 1391(b).

5.      Plaintiff filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding her allegations under Title VII on July 21, 2020, under charge number 530-2020-03092. *See* Exhibit 1.

## III. Parties

6.      Plaintiff, Shaila Chempakaseril ("Plaintiff"), is an adult individual with a primary residence located at 1888 Foster Street, Philadelphia, PA 19116.

7.      Defendant, Mercy Catholic Medical Center of Southeastern Pennsylvania, d/b/a Mercy Catholic Medical Center — Mercy Fitzgerald Campus ("Defendant"), is a corporation with a principal place of business at 1500 Lansdowne Avenue, Darby, PA 19023.

## IV. Facts

8.      Plaintiff began working for Defendant as a Clinical/Staff Pharmacist in September 2015.

9.      Plaintiff's job duties generally included attending rounds to care for patients affected by infectious diseases; auditing and determining the appropriateness of antibiotic use;

evaluating appropriateness of microbial use; educating staff and independent practitioners regarding antimicrobial use and resistance; serving as a drug information resource to Defendant employees; checking technician-prepared medication; and delivering clinical pharmacy services to patients.

10.     During Plaintiff's tenure, Ms. Kelly Morrison, Pharmacy Manager for Defendant ("Ms. Morrison"), continually discriminated against Plaintiff, an Asian woman, due to her membership in her respective protected classes.

11.     On one occasion, Ms. Morrison stated that she preferred working with male employees over female employees.

12.     On another occasion, Ms. Morrison admitted that she intentionally removed female applicants' applications for certain roles.

13.     Despite the fact that Plaintiff was equally as qualified as her male colleagues, both professionally and experientially, her male colleagues were repeatedly given preferential treatment and access to professional development opportunities by Ms. Morrison.

14.     For example, Ms. Morrison selected two white male pharmacists to join the Pharmacy & Therapeutics committee ("P&T committee"), even though Plaintiff expressed interest in joining the committee.

15.     Ms. Morrison placed two white male pharmacists on the email invite list for the P&T committee, including one white male pharmacist who was a per diem employee of Defendant.

16.     Eventually, Plaintiff was invited to a P&T committee meeting by a physician.

17.     When Plaintiff attended the meeting, Ms. Morrison, in a condescending tone, questioned Plaintiff as to why she joined the meeting.

18.     In December 2019, an opportunity was made available to Defendant's employees to attend a national meeting; however, only male employees were selected to participate.

19.     Female employees, including Plaintiff, were equally qualified for this and other professional advancements; however, only male employees were selected for numerous opportunities.

20.     Throughout the course of her employment, Defendant failed to hire Plaintiff for three roles: an Intensive Care Unit ("ICU") Pharmacist role in 2016; a Clinical Coordinator role in 2017; and a Clinical Pharmacy Leader role in 2019.

21.     At the time that Plaintiff applied for the role of ICU Pharmacist in 2016, she had been working as the interim ICU Pharmacist for four months.

22.     Plaintiff expressed interest in the role to her supervisors, all of whom were of decision-making capacity for Defendant.

23.     In response, Plaintiff's supervisors stated that she would be hired for the ICU Pharmacist role if she performed proficiently in her interim position.

24.     Plaintiff performed proficiently in her interim position.

25.     Plaintiff did not formally apply for the ICU Pharmacist role because she believed that to do so would be a futile gesture based upon Defendant's historic acts of preferential treatment toward white males.

26.     Defendant did not select Plaintiff for the role, despite her qualifications.

27.     Instead, Defendant hired an outside white male applicant for the ICU Pharmacist role.

28.     Plaintiff and the outside white male applicant possessed the same degree, a Doctorate of Pharmacy from the same university.

29.     During Plaintiff's tenure with Defendant, Ms. Morrison discriminated against an Asian woman, also a member of Plaintiff's protected class, who held the Clinical Coordinator position.

30.     Ms. Morrison diminished the other woman's responsibilities, berated her in front of colleagues, and subjected her to unfair disciplinary practices.

31.     At one point, Ms. Morrison asked the Plaintiff when the other woman would finally leave.

32.     Shortly thereafter, the other woman resigned from her Clinical Coordinator role.

33.     In 2017, Plaintiff expressed interest in the Clinical Coordinator role to Ms. Morrison.

34.     Defendant's Clinical Coordinator role remained vacant for months.

35.     Plaintiff did not formally apply for the position because, again, she believed that to do so would have been a futile gesture.

36.     Eventually, a white male was offered the position; subsequently, he rejected the offer.

37.     Plaintiff also expressed interest in a Pharmacy Clinical Leader position in 2020.

38.     Plaintiff formally applied for the position on or around February 13, 2020. *See* Exhibit 2.

39.     Plaintiff had the requisite qualifications: she possessed over four years of clinical experience with Defendant; six years of overall pharmacy experience; a board certification in infectious disease; experience educating hospital staff; serving as a Preceptor; and experience on various hospital committees.

40. Defendant selected a white female applicant who possessed the same Doctorate of Pharmacy degree as Plaintiff from the same university, only graduating the year prior.

41. Though the hospital was poised to hire the white female applicant, the position was ultimately removed altogether.

42. Plaintiff invoked her right to FMLA-qualifying leave from August 15, 2019, until September 2, 2019.

43. When Plaintiff returned from FMLA leave in September 2019, she was required to make-up missed weekend shifts.

44. However, when Plaintiff's Asian male and white female co-workers returned from similar bouts of leave, they were not required to make-up missed weekend shifts.

45. Plaintiff brought this issue to the attention of Defendant's Human Resources ("HR") department, as Defendant's scheduling decision surpassed mere scheduling needs and occurred directly following Plaintiff's return from FMLA leave.

46. During a meeting with a HR representative and Ms. Morrison regarding Plaintiff's scheduling concerns, Ms. Morrison stated that Plaintiff was "disruptive" for raising the issue.

47. On April 6, 2020, Plaintiff filed a formal complaint due to Defendant's failure to hire for the Pharmacy Clinical Leader position and Ms. Morrison's discrimination.

48. On April 7, 2020, Plaintiff resigned from her position as she felt she had no other option, given Defendant's discriminatory treatment and diminishment of Plaintiff's professional development opportunities due to her race and gender.

## COUNT I
### Gender Discrimination-Failure to Promote

49. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

50.     Under Title VII, it is unlawful for an employer to discharge or otherwise discriminate against any individual on the basis of gender. 42 U.S.C. § 2000e-2(a)(1).

51.     To bring a claim for failure to promote on the basis of gender under Title VII, a plaintiff must satisfy the burden of proof framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

52.     Under this framework, a plaintiff must first state a *prima facie* case of discrimination. *Id*. at 802.

53.     To establish a *prima facie* case of a gender-based discriminatory failure to promote, a plaintiff show that: (1) she was a member of a protected class; (2) she was qualified for and applied to an open position; (3) she was rejected "despite [her] qualifications;" and (4) the position remained open after her rejection. *Id.*

54.     If a valid *prima facie* case of discrimination exists, there is a presumption of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

55.     Certain exceptions allow a plaintiff to establish a *prima facie* case even if she did not apply for the position at issue, including the futile gesture exception. *Intl. Broth. of Teamsters v. U.S.*, 431 U.S. 324, 366 (1977).

56.     As such, "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.*

57.     In order to show that a plaintiff's attempt to apply for an open position would be futile under this framework, the plaintiff must provide that she was "deterred by the employer's discriminatory practices and that [she] would have applied for the job but for those practices."

*Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 907 F.2d 1408, 1414 (3d Cir. 1990) (citing *Intl. Broth. of Teamsters*, 431 U.S. 324 at 367-68).

58.     Discriminatory practices which may deter an applicant include, but are not limited to, "the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups." *Intl. Broth. of Teamsters*, 431 U.S. 324 at 365.

59.     Additionally, the plaintiff must show that she actually wanted the job and possessed the requisite qualifications. *Id.*

60.     Despite the fact that a plaintiff may be time-barred on certain claims, if she is able to establish a continuing violation on the part of her employer, such violations may be considered as an ongoing act. See *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754–55 (3d Cir. 1995). As such, "[t]o establish that a claim falls within the continuing violations theory, the plaintiff must do two things. First, he must demonstrate that at least one act occurred within the filing period: 'The crucial question is whether any present violation exists.' *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). Next, the plaintiff must establish that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination." *West,* 45 F.3d 744 at 754–55.

61.     Further, the "relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *Id.*

62.     Inquiry into existence of continuing violation under Title VII considers: subject matter—whether violations constitute the same type of discrimination; frequency; and permanence—whether nature of violations should trigger employee's awareness of the need to assert her rights and whether consequences of act would continue even in the absence of continuing

intent to discriminate. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

63.     Here, Defendant unlawfully failed to promote Plaintiff on the basis of gender in violation of Title VII as Plaintiff can satisfy the burden of proof framework provided in *McDonnell Douglas Corp.*

64.     Defendant unlawfully failed to promote Plaintiff to the roles of ICU Pharmacist in 2016 and Clinical Coordinator posted in 2017.

65.     For both the ICU Pharmacist and Clinical Coordinator roles, Plaintiff can establish a *prima facie* case of discrimination under the futile gesture exception.

66.     First, Plaintiff, a woman of Asian descent, is a member of a protected class on the basis of both her sex and her race.

67.     Second, Plaintiff was qualified for both of these roles.

68.     Plaintiff began working as the acting ICU Pharmacist in 2016 and held this position for four months.

69.     Plaintiff expressed specific interest in this position to several individuals with decision making power. In doing so, Plaintiff expressed a real and present interest in the position at issue.

70.     Due to the entrenched forms of discrimination in Defendant's workplace, it would have been a futile gesture for Plaintiff to formally apply to the position.

71.     Such act would be futile because, for example, Ms. Morrison stated that she preferred working with men to women.

72.     Even more, Ms. Morrison admitted that she intentionally removed female applicants' applications when hiring for certain roles.

73.    Ms. Morrison was in a direct supervisory role and had discretion over candidate selection and many employees' access to professional development opportunities.

74.    When an individual in a supervisory role, who is responsible for many employees' access to professional development opportunities, makes clear that they prefer working with men to women, entrenched discrimination is present.

75.    Entrenched discrimination is present because women are then unable to fill certain roles and access certain professional development opportunities solely due to the supervisor's unequal treatment and attitude toward female employees.

76.    To give another example, only male employees of Defendant were selected to attend a national meeting of the health system in December 2019.

77.    In this national meeting, representatives learned about new software changes for training purposes.

78.    Defendant only deemed male employees to have the technical savvy, workflow understanding, and skill requisite to attend the meeting.

79.    However, female employees of Defendant similarly possessed and demonstrated sufficient technical savvy, workflow understanding, and still required to attend the meeting.

80.    Despite the female employees' qualifications, only male employees were selected to attend the national meeting in December 2019.

81.    This example further proves Defendant's entrenched discrimination as only male colleagues were deemed qualified enough to attend certain professional development opportunities, even when female employees possess and demonstrate the same skillset and knowledge.

82.     The December 2019 meeting is only one example in a pattern of discrimination against female employees regarding access to professional development opportunities.

83.     To give another example of Defendant's entrenched forms of discrimination, only white male pharmacists were selected to join the Pharmacy & Therapeutics committee ("P&T committee").

84.     Ms. Morrison placed two white male pharmacists on the official email invitee list for this committee, though Plaintiff expressed interest in joining.

85.     Of the two, one white male pharmacist was not a full-time employee of the hospital, but a recently hired part-time pharmacist.

86.     On one occasion, a physician invited Plaintiff to attend a P&T meeting.

87.     This specific P&T meeting pertained to Plaintiff's daily work.

88.     Though Plaintiff was invited to this meeting, Ms. Morrison, in a condescending tone, asked Plaintiff why she was present at the meeting.

89.     Given the above instances of Defendant's discriminatory practices, Plaintiff held a justifiable belief that submitting a formal application for the ICU Pharmacist and Clinical Coordinator roles would have been a futile gesture.

90.     Further, Defendant's discriminatory practices constitute a continuing violation, extending the limitations period.

91.     The Defendant's discriminatory practices are distinguishable from the present consequence of a one-time violation.

92.     First, at least one act occurred within the filing period: the Defendant discriminated against Plaintiff for a job application in 2019 for Clinical Pharmacy Leader.

93.     Second, the Plaintiff can establish that the harassment is more than the Defendant's practices are more than isolated or sporadic acts of intentional discrimination.

94.     As listed above, male employees were given preference for numerous professional development opportunities over female employee.

95.     These instances of discrimination are repeated and occurred over the span of years.

96.     Even more, these instances of discrimination can be distinguished from sporadic or isolated instances of discrimination.

97.     Also, Defendant's violations were for different professional development opportunities and would not be expected to trigger Plaintiff's awareness of the need to assert her rights.

98.     Therefore, Defendant unlawfully failed to promote Plaintiff under the futile gesture exception. The limitations period is extended as Defendant's actions constitute a continuing violation.

99.     The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Plaintiff's rights protected under federal law to be free from discrimination.

WHEREFORE, Plaintiff hereby requests Plaintiff hereby requests that this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff prays this Honorable Court award back pay, front pay, compensatory and liquidated damages as authorized by statute, prejudgment and continuing interest, and reasonable attorney's fees.

## COUNT II

### Race Discrimination-Failure to Promote

100.    The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

101.    To establish a *prima facie* case of a racially discriminatory failure to promote, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for and applied to an open position; (3) she was rejected "despite [her] qualifications;" and (4) the position remained open after her rejection. *McDonnell Douglas Corp.*, 411 U.S. 792 at 802.

102.    Again, if a valid *prima facie* case of discrimination exists, there is a presumption of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. 502 at 506.

103.    A plaintiff who does not formally apply for a position may nevertheless establish a prima *facie claim* of failure to promote under the futile gesture exception. *Int. Broth. of Teamsters*, 431 U.S. 324 at 366. In doing so, a plaintiff must provide that she was "deterred by the employer's discriminatory practices and that [she] would have applied for the job but for those practices." *Newark Branch*, 907 F.2 1408 at 1414.

104.    Additionally, the fact that a plaintiff may be time-barred on certain claims, if she is able to establish a continuing violation on the part of her employer, such violations may be considered as an ongoing act. See *West*, 45 F.3d 744 at 754–55. As such, "[t]o establish that a claim falls within the continuing violations theory, the plaintiff must do two things. First, he must demonstrate that at least one act occurred within the filing period: 'The crucial question is whether any present violation exists.' *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). Next, the plaintiff must establish that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination." *West,* 45 F.3d 744 at 754–55.

105.     Here, Defendant unlawfully failed to promote Plaintiff on the basis of race in violation of Title VII as Plaintiff can satisfy the burden of proof framework provided in *McDonnell Douglas Corp.*

106.     Plaintiff was a member of a protected class on the basis of her race and ethnicity, which is Asian.

107.     Plaintiff was qualified for all of the positions which she sought based on her job performance, experience, and education.

108.     Under the same guise as her rejection from these positions on the basis of her race, Plaintiff was denied the advanced opportunities on the basis of her race.

109.     On all three occasions, including the 2020 job opening, the position either remained open after Plaintiff was overlooked for the role or was offered to a *white* individual not protected by the provisions of Title VII.

110.     Defendant unlawfully failed to promote Plaintiff to the roles of ICU Pharmacist in 2016 and Clinical Coordinator posted in 2017.

111.     For both the ICU Pharmacist and Clinical Coordinator roles, Plaintiff can establish a *prima facie* case of discrimination under the futile gesture exception.

112.     First, Plaintiff, a woman of Asian descent, is a member of a protected class on the basis of both her sex and her race.

113.     Second, Plaintiff was qualified for both of these roles.

114.     Plaintiff began working as the acting ICU Pharmacist in 2016 and held this position for four months.

115.    Plaintiff expressed specific interest in this position to several individuals with decision making power. In doing so, Plaintiff expressed a real and present interest in the position at issue.

116.    Due to the entrenched forms of discrimination in Defendant's workplace, it would have been a futile gesture for Plaintiff to formally apply to the position.

117.    Only *white* male pharmacists were selected to join the Pharmacy & Therapeutics committee ("P&T committee").

118.    Ms. Morrison placed two *white* male pharmacists on the official email invitee list for this committee, though Plaintiff expressed interest in joining.

119.    Of the two, one white male pharmacist was not a full-time employee of the hospital, but a recently hired part-time pharmacist.

120.    On one occasion, a physician invited Plaintiff to attend a P&T meeting.

121.    This specific P&T meeting pertained to Plaintiff's daily work.

122.    Though Plaintiff was invited to this meeting, Ms. Morrison, in a condescending tone, asked Plaintiff why she was present at the meeting.

123.    Given the above instances of Defendant's discriminatory practices, Plaintiff held a justifiable belief that submitting a formal application for the ICU Pharmacist and Clinical Coordinator roles would have been a futile gesture.

124.    Further, Defendant's discriminatory practices constitute a continuing violation, extending the limitations period.

125.    The Defendant's discriminatory practices are distinguishable from the present consequence of a one-time violation.

126.    First, at least one act occurred within the filing period: the Defendant discriminated against Plaintiff for a job application in 2019 for Clinical Pharmacy Leader.

127.    Second, the Plaintiff can establish that the harassment is more than the Defendant's practices are more than isolated or sporadic acts of intentional discrimination.

128.    As listed above, male employees were given preference for numerous professional development opportunities over female employee.

129.    These instances of discrimination are repeated and occurred over the span of years.

130.    Even more, these instances of discrimination can be distinguished from sporadic or isolated instances of discrimination.

131.    Also, Defendant's violations were for different professional development opportunities and would not be expected to trigger Plaintiff's awareness of the need to assert her rights.

132.    Therefore, Defendant unlawfully failed to promote Plaintiff under the futile gesture exception. The limitations period is extended as Defendant's actions constitute a continuing violation.

WHEREFORE, Plaintiff hereby requests Plaintiff hereby requests that this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff prays this Honorable Court award back pay, front pay, compensatory and liquidated damages as authorized by statute, prejudgment and continuing interest, and reasonable attorney's fees.

## <u>COUNT III</u>

### FMLA Retaliation

133.    The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

134.   In order to prove a FMLA retaliation claim, the Plaintiff must show: (1) he invoked his right to FMLA-qualifying leave; (2) he suffered an adverse employment action; (3) the adverse action was causally related to his invocation of rights. *Lichenstein v. U. of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d. Cir. 2012).

135.   The two main factors relevant with respect to establishing a causal link to establish a *prima facie* case of FMLA retaliation are: (1) timing; and/or (2) evidence of ongoing antagonism. *Savvrese v. Lowe's Home Center, Inc.*, 320 F. Supp.2d 311 (W.D. Pa. 2004).

136.   Here, Plaintiff invoked her right to FMLA-qualifying leave from August 15, 2019, until September 2, 2019.

137.   Next, Plaintiff suffered an adverse employment action when she was required to make up a missed weekend shift following her return from FMLA leave while Plaintiff's Asian male and white female co-workers were not required to do so following their leave.

138.   Plaintiff brought this issue to the attention of Defendant's Human Resources department, as the Defendant's scheduling decision surpassed mere scheduling needs and occurred directly following Plaintiff's return from FMLA leave.

139.   During a meeting with a Human Resources representative and Ms. Morrison regarding Plaintiff's scheduling concerns, Ms. Morrison stated that Plaintiff was "disruptive" for raising the issue.

140.   Given the circumstances, the Defendant's decision to: 1 ) subject Plaintiff to a burdensome work schedule following her FMLA leave; and 2) subject Plaintiff to negative treatment for raising her concerns with Human Resources does not constitute reasonable treatment of an employee returning from FMLA leave.

141.    Further, the Defendant's conduct is likely to deter an employee from taking FMLA leave.

142.    As such, the Defendant's conduct constitutes an adverse employment action

143.    Third, there is a causal link between the Defendant's adverse employment action and Plaintiff's invocation of her right to FMLA leave.

144.    Regarding timing, Plaintiff was only asked to make-up her missed weekend shift following her return from FMLA leave in September 2019.

145.    Concerning evidence of ongoing antagonism, the Plaintiff was subjected to negative treatment for raising her FMLA scheduling concerns to Human Resources: Ms. Morrison stated that Plaintiff was "disruptive" for raising her concerns.

146.    In addition to the imposition of a burdensome work schedule and Defendant's negative treatment following the Human Resources meeting, the Plaintiff was subjected to ongoing antagonism.

147.    As such, there is a causal link between the Defendant's adverse employment action and Plaintiff's invocation of her FMLA rights because the adverse actions only occurred after Plaintiff's FMLA leave and ongoing antagonism persisted

148.    Therefore, Defendant unlawfully retaliated against Plaintiff for taking FMLA leave.

149.    The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Plaintiff's rights protected under federal law to be free from discrimination.

WHEREFORE, Plaintiff hereby requests Plaintiff hereby requests that this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff prays this Honorable

Court award back pay, front pay, compensatory and liquidated damages as authorized by statute,

prejudgment and continuing interest, and reasonable attorney's fees.

Respectfully Submitted,
/s/ Prabhu Narahari
Prabhu Narahari, Esq.
PA ID: 323895
**Manes & Narahari LLC**
Law & Finance Building
429 Fourth Avenue, Suite 300
Pittsburgh, PA 15219
(412) 626-5588 Direct
(412) 650-4845 Fax
pn@manesnarahari.com

**VERIFICATION**

I, Shaila Chempakaseril, swear under penalty of perjury under the laws of the United States of America that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge.

_____
Shaila Chempakaseril

## VERIFICATION

I, Shaila Chempakaseril, swear under penalty of perjury under the laws of the United States of America that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge.

SC
_____
Shaila Chempakaseril

20